UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-CR-181(4)(PJS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

BRANDEN MICHAEL WOLFE,

Defendant.

**GOVERNMENT'S SENTENCING MEMORANDUM**

For the following reasons, the United States recommends that Defendant Branden Michael Wolfe receive a sentence 42 months imprisonment. The United States believes that such a sentence is sufficient, but not greater than necessary, to comport with the Section 3553(a)(2) sentencing factors.

## I.  Relevant Facts

### A. Offense Conduct

On May 25, 2020, George Floyd died while being arrested by the Minneapolis Police Department. (Presentence Investigation Report ("PSR") ¶ 11, ECF No. 125.) The nature and circumstances of Mr. Floyd's arrest, subsequent death, and the actions of the Minneapolis Police Department came under intense public scrutiny. (*Id.*) Almost immediately following Mr. Floyd's death, public protests began in Minneapolis and expanded throughout the Twin Cities metro area. (*Id.*)

Following the mostly peaceful protests that occurred on May 26, 2020, the cities of Minneapolis and St. Paul endured multiple nights of violence and destruction. (PSR ¶ 12.) Between May 27 and May 30, 2020, following several peaceful protests, hundreds of

CASE 0:20-cr-00181-PJS-BRT   Doc. 174   Filed 04/15/21   Page 2 of 12

individuals vandalized and looted local businesses and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, and throwing objects. (*Id.*) The Minneapolis neighborhood surrounding the East Lake Street-Hiawatha intersection, near the site of the police's encounter with Mr. Floyd, was particularly hard hit, with numerous business in the neighborhood looted and partially destroyed by vandalism and arson (*Id.*) On May 27, 2020, several businesses surrounding the Third Precinct were looted, and multiple fires were set, including to an apartment complex under construction that was essentially destroyed. (*Id.*) City authorities began to discuss if the Third Precinct building should be abandoned, and vehicles, weapons, computers, and sensitive files were ultimately moved offsite. (*Id.*)

On May 28, 2020, it became clear that assistance was required. The National Guard was called on to assist in the city of Minneapolis. (PSR ¶ 13.) Throughout the day, hundreds of people remained gathered around the Third Precinct building. (*Id.*) A small handful of officers were stationed on the roof guarded the building. (*Id.*) A mobile fence had been erected around the building which was increasingly tested by the protestors as the evening went on. (*Id.*) At about 9:30 p.m., the approximately 15 to 20 officers that remained at the Third Precinct were ordered to evacuate as the crowd, which by some estimates topped 1,000 people, grew larger and more aggressive, and became increasingly uncontrollable. (*Id.*)

Shortly after 10 p.m., an individual breached the temporary fence that had been protecting the Third Precinct building. (PSR ¶ 14) Soon after, many protestors followed and entered the building. (*Id.*) Rioters damaged property and set multiple fires in the

2

building. (*Id.*) Firefighters could not reach the building due to the large number of protestors and the violent acts of the rioters. (*Id.*) The fires were eventually extinguished the following morning. (*Id.*)

Branden Michael Wolfe was at the Third Precinct building while it was burning. (PSR ¶ 21.) While at the scene, Wolfe (pictured below in the foreground) pushed a barrel into an existing fire located near the entrance to the Third Precinct, which had been previously set by others with the intent to accelerate it. (*Id.*)



At some point that evening, Wolfe entered the Third Precinct building and stole several items, including a police vest, duty belt, handcuffs, earpiece, baton, knife, riot helmet, pistol magazine, police radio, police overdose kit, uniform name plates, and

ammunition. (*Id.*) Wolfe was arrested on June 3, 2020, wearing the police vest, the duty belt and carrying the tactical baton at his former place of employment, where he worked as a security guard. (*Id.*)




B. **Community Impact**

Wolfe and his co-conspirators' conduct impacted the surrounding community, both those associated with the Third Precinct as well as community business owners and residents more broadly.

Multiple officers stationed at the Third Precinct submitted victim impact statements. They described the impact of seeing their workplace destroyed. Family members of law enforcement officers also submitted statements, like the young child that discussed the

feeling of seeing her mother's place of work burn live on television while worrying about the safety of her mother. Civilian employees who worked at the Third Precinct also submitted statements. One individual, a Crime Prevention Specialist, addressed community members' concerns for high crime areas located in the precinct. He discussed the damage to the community by the loss of community programs like the Community Response Team and Neighborhood Coordination Officers, and how those in the community rely on those resources. Numerous community members also submitted statements describing the impact of the destruction of the Third Precinct. One described the impact to the community of the lack of police resources due to the Third Precinct being destroyed, including that the police are hampered in their ability to respond to crime due to the absence of the precinct building. Others discussed the defeat, despair, and fear they felt as community members witnessing firsthand the destruction to their local police precinct.

In the plea agreement, the parties agreed that the Mandatory Victims Restitution Act applies and that the total amount of restitution for the loss suffered by the Minneapolis Police Department was $12,000,000. (PSR ¶ 23.) Those costs include rebuilding or repairing the Third Precinct building, as well as additional costs for equipment, clean up, and overtime pay for city employees in the aftermath of the arson. (PSR ¶ 24.)

**C. History of the Defendant**

    1.    **Wolfe's Personal Background**

Wolfe is 23 years old. (PSR ¶ 52.) Wolfe had a difficult childhood, during which he was subjected to domestic violence committed by his biological father against his mother. (*Id.*) Growing up, he had very little contact with his biological father, and his relationship

with his mother, who remarried, was strained. (*Id*.) Although in his early years he had a good relationship with his stepfather, he was later kicked out of the family home over a rent dispute. (PSR ¶¶ 52, 55). As a result, Wolfe was homeless for a few years, and was sexually assaulted during this period by a man who offered him a place to stay. (PSR ¶ 55).

Wolfe has a limited educational background, only completing homeschooling up to the eighth grade. (PSR ¶ 54).

Wolfe was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a child, and currently has a diagnosis of Bipolar Disorder. (PSR ¶ 62). Wolfe has previously been suicidal, and in March 2019 was hospitalized for threatening to kill himself by jumping off a bridge. (*Id.*). He is currently receiving mental health therapy and medication. (*Id.*)

      2.      **Wolfe's Criminal History**

Wolfe's criminal history for the most part revolves around domestic abuse incidents directed at the mother of his child, BH. He was convicted of Trespassing and Interference with an Emergency Telephone Call in 2019. (PSR ¶¶ 43, 44). Wolfe was on probation when he committed the instant offense. (PSR ¶ 46). In addition, several charges against Wolfe involving violence against BH were dismissed. (PSR ¶¶ 48, 49).

The Government concurs with the PSR that Wolfe's criminal history is II. (PSR ¶ 47).

D. **Procedural History**

Wolfe pled guilty to a single count Indictment charging him and three co-defendants with Conspiracy to Commit Arson. (PSR ¶ 2.) In his plea agreement, Wolfe agreed that the base offense level was 24 and no adjustments or enhancements applied. (PSR ¶ 6.) The parties agree that a three-level reduction for acceptance of responsibility would reduce the total offense level to 21. (Id.) The parties opined that Wolfe's criminal history was I, which would have resulted in a guideline range of 37-46. (Id.) Wolfe's actual criminal history is II, so the guideline range is 41-51 months imprisonment. (PSR ¶ 76.) Wolfe also stipulated that the loss amount for purposes of restitution was $12,000,000, but the parties reserved their rights to make legal arguments about the amount of restitution to be paid by Wolfe.

II. **Argument**

A. **Legal Background**

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "[U]nder the advisory guidelines scheme, sentencing judges are required to find sentence-enhancing facts only by a preponderance of the evidence." *United States v. Scott*, 448 F.3d 1040, 1043 (8th Cir. 2006).

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50; 18 U.S.C. § 3553(a). The Section 3553(a) factors include "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence

7

to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### B. The Presentence Investigation and Guidelines Calculations

The United States has reviewed the PSR prepared by the U.S. Probation Office. As noted in the PSR, the parties entered a plea agreement on December 21, 2020. The total offense level contemplated in the plea agreement is inconsistent with the PSR, based on the parties' underestimation of Wolfe's criminal history. However, the PSR correctly found Wolfe fell into Criminal History Category II, and Wolfe did not object.

The PSR concluded that, based on a total offense level of 21 and criminal history category of I, the resulting advisory Guidelines range of imprisonment is 41 to 51 months imprisonment.

### C. The Appropriate Sentence

A careful consideration of the Section 3553(a) factors warrants a sentence of 42 months imprisonment.

> 1. **The Nature and Circumstances of the Offense and the Need for the Sentence Imposed to Reflect the Seriousness of the Offense**

Wolfe participated in an unquestionably serious conspiracy to commit arson at a police station. He added to an ongoing blaze by adding a wooden barrel to the fire burning near an entrance to the Third Precinct building.

However, Wolfe was one of only many who participated in the destruction of an active police station. Investigating agents identified at least 45 areas of origin where fires

had been started throughout the Third Precinct building. Dozens of unidentified co-conspirators participated in setting those fires, along with looting, vandalism, and destruction of the rest of the building. From a destruction standpoint, Wolfe's singular act of rolling a barrel into a lit fire outside the building played an average (or even below average) role compared to others.

On the other hand, Wolfe, in addition to conspiring to commit arson, entered the Third Precinct building after it had been abandoned and stole a significant amount of public property. At best, these items could be viewed as merely souvenirs. At worst, some of the items could have been used in future violent protests, including the body armor, police baton and handcuffs. In fact, Wolfe was arrested wearing the body armor and police belt and carrying the baton. Some additional culpability is warranted for this conduct.

In his written statement of acceptance of responsibility, Wolfe acknowledged that he took "full responsibility" for his actions, but also acknowledged the role played by his ongoing struggles with mental illness. (PSR ¶27 .)

The protests of racial injustice following the death of George Floyd and events leading up to the arsons at the Third Precinct were unprecedented. Importantly, much of the anger and pain of protesters was directly aimed at the Third Precinct – as a building and as a symbol – because all four officers associated with the death of George Floyd were stationed at the Third Precinct. That fact in no way excuses the violence or destruction aimed at the Third Precinct. It does, however, create a juxtaposition against the violence and destruction of seemingly unrelated buildings in the community, including a school,

liquor stores, pawn shops, and a post office (to name but a few examples of local businesses that were looted, vandalized, set on fire, or otherwise destroyed).

Ultimately, however, the sentence imposed must reflect the unquestionably serious nature of the offense. Wolfe joined others in keeping the fires burning at the Third Precinct building. He participated in the near total destruction of an active police precinct that caused $12 million in damages. The neighborhoods served by the Third Precinct faced unique challenges of dealing with an increase in crime rates without a precinct to house the police force charged with protecting those neighborhoods.

In addition, the sentence should reflect the seriousness of arson, a violent felony. Wolfe and his co-conspirators started a fire in proximity to the entrance of the Third Precinct – with multiple people in their vicinity and an unknown number of people inside the building. He risked the lives of the numerous individuals inside the Third Precinct. Once a fire is started, it can spread uncontrollably and cause untold damage to people or property. This is precisely why arson is considered a violent crime. A significant sentence will reflect the serious risks to and impact on the community from the arsons committed at the Third Precinct.

2. **The History and Characteristics of the Defendant**

Wolfe had a chaotic childhood, marked by domestic violence between his parents, a lack of education and socialization, and childhood mental illness. These challenges shaped him greatly. He has engaged in domestic violence. His mental illness continues to affect his life choices.

Wolfe's criminal history is concerning. At his young age, he has two convictions related to domestic violence against a single victim, and several domestic abuse charges that were dropped. He objects to the inclusion of the dropped offenses in the PSR, but the Court should consider them because they are significant in determining whether Wolfe will continue to engage in violent activity.

Wolfe's statement regarding acceptance of responsibility was perfunctory. In his statement of acceptance, he expresses no remorse for his actions. He largely blames his mental illness for the choice he made to join a violent protest and assist in burning down a police station.

Wolfe correctly notes that he met with the Government soon after he was charged and provided what appeared to be a truthful proffer. He entered a guilty plea early and admitted his culpability without engaging in protracted litigation.

      3.      **The Need for the Sentence Imposed to Promote Respect for the Law and Afford Adequate Deterrence.**

It is almost unfathomable to think that an active police precinct in the city of Minneapolis was overrun, looted, vandalized, and set on fire. This conduct represents a total breakdown of respect for the law. A significant sentence is necessary to promote respect for the law.

The sentence should have an overall deterrent effect. The sentence imposed must be tailored to prevent Wolfe from committing another crime. This is Wolfe's first felony conviction and marked a significant departure from his otherwise relatively minor criminal history. The Government does believe that a significant sentence is necessary to provide

11

specific deterrence to prevent Wolfe from escalating his behavior and committing another serious crime. In addition, general deterrence is also necessary to demonstrate the importance of laws and deter future conduct. *See Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) ("Congress specifically made general deterrence an appropriate consideration . . . and [the Eighth Circuit has] described it as 'one of the key purposes of sentencing.'") Others are more likely to be deterred from committing similar violence and destruction if they learn they will pay a stiff price for it.

A sentence of 42 months imprisonment will serve the needs of sentencing to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence.

### 4. The Need to Avoid Unwarranted Sentencing Disparities

Three co-defendants have plead guilty and are presently awaiting sentencing before this Court. The Government is not aware of any other cases that would create an unwarranted sentencing disparity.

## III. Conclusion

For all the above reasons, the United States respectfully requests that the Court impose a sentence of 42 months imprisonment.

Respectfully submitted,

Dated: April 15, 2021

W. ANDERS FOLK
Acting United States Attorney

/s/ *David P. Steinkamp*
BY: DAVID P. STEINKAMP
HARRY M. JACOBS
Assistant U.S. Attorneys