UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 20-181 (PJS/BRT) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **DEFENDANT'S SENTENCING** |
| | ) | **POSITION PAPER** |
| BRANDEN MICHAEL WOLFE, | ) | |
| | ) | |
| Defendant. | | |

## INTRODUCTION

During the early morning hours of May 29, 2020, Branden Wolfe shoved a
wooden barrel towards the entrance of the third precinct police station, which by then
was already burning. This split-second decision to push the barrel into the fire was the
culmination of his three day's participation in what had had originally been a peaceful
protest movement following the death of George Floyd, influenced by Mr. Wolfe's
untreated bi-polar disorder which had, by that evening, resulted in increasingly manic
behavior,  and the co-influence of marijuana and alcohol intoxication.  So, he pushed the
barrel towards the fire, thus joining the conspiracy of what was perhaps hundreds of
participants, who participated in the unplanned group dynamic which led to the
destruction of the third precinct station. Now Mr. Wolfe faces sentencing for his role in
this offense.

While the guidelines in this case advise a sentence of imprisonment, those
guidelines are non-binding and advisory only, and in this case advise a sentence which is
unjust and disproportionate, and far "greater than necessary" to satisfy the purposes of

1

federal sentencing set forth at 18 U.S.C. 3553(a).[1] Indeed, a sentence of time served and

probation would more than satisfy the sentencing factors of just punishment, deterrence,

and reflect the seriousness of the offense, while recognizing the individual characteristics

of Mr. Wolfe, a 23 year-old with a minor criminal record, and treatable contributing

conditions of mental illness and chemical dependency, for which he has been receiving

much needed help and treatment, therapy and medication, all of which he has embraced

and taken to heart.  In addition, the court should note his overall minor role in the greater

arson, the lack of planning or sophistication involved, and the overall circumstances of

the offense, as well as his post-offense cooperation with the authorities, remorse,

acceptance of responsibility, and the important changes that Mr. Wolfe has embraced in

the aftermath of this prosecution.  There is little positive to be gained by imprisoning Mr.

Wolfe, while a sentence of probation would permit him to continue to work on his

important post-offense rehabilitation.  In short, a sentence of time served and probation,

with residence at a residential re-entry center and substantial community service, is a fair

and appropriate sentence for this young man in this case, and is in keeping with this

court's overall admonition to impose a sentence which is "sufficient but not greater than

necessary."

## FACTUAL BACKGROUND

Branden Wolfe is 23 years old.   He was born and raised in Florida, and he

suffered a serious brain infection and traumatic seizure event soon after his birth which

---

[1] The guideline range as determined by the PSR is 41-51 months.

may have left him with some form of neurological impairment.  PSR. Par. 58.  His birth father was abusive, and Branden's mother divorced Branden's father when Branden was two; his birth father has never had any meaningful role in his life.  His mother later met her subsequent husband during chemical dependency recovery and treatment; she remarried when Branden was seven.

The family situation after his mother remarried was stable but perhaps a bit unusual. Mr. Wolfe struggled with ADHD and behavioral issues as a young child, he did not trust adults, did not listen particularly well, was defiant, and did not feel particularly loved or perhaps even wanted by his family.  How much of this was a function of his ADHD and the after effects of his abusive birth father's influence is hard to gauge, but it is safe to say that he had a difficult childhood and was indeed a difficult child.  He had also had few friends and was a loner as a child, a bit of a misfit.  He felt "different."

His mother pulled him out of school when he was in fifth grade and home schooled him after that, so he did not get the benefit of social interaction with his peers growing up, was a bit of an outcast and a loner, and never really learned a lot of the social skills that can only be developed by daily interactions with one's peer group. In addition, his mother ran a day care at the house as well as a dog rescue service, so his formative years were filled with strange dogs and kids and the chores of attending to the needs of both: he lived in a home with up to 27 dogs and a bunch of little kids and never developed good social skills. He recalls sharing his bedroom with 7-8 dogs in their cages, certainly an unusual living arrangement for a child with mental health issues.

Branden quit school (chose to discontinue his home schooling) during the 11th grade, he wasn't interested and did not see the point, and he began working full-time. He moved out by of his parent's house (by mutual agreement) when he was 18, and he has been on his own ever since.

His journey over the next few years consisted of chasing a volatile relationship, homelessness, homeless shelters, living on the beach, and general instability which, in retrospect, underscored a growing problem with his untreated and undiagnosed mental health issues. Branden Wolfe pursued a relationship he now describes as "toxic" with M., and followed her around the southern states for two years before literally waking up in her car headed to Minnesota, where they eventually landed. What started out as a "road trip" to visit friends in Tampa Bay when he was 18 became a two-year odyssey with stops in North Carolina, Tennessee, Florida, Georgia, and South Carolina in pursuit of a mutually toxic and unstable relationship between two immature young people with poor coping and life skills, feeding each other's chaos and volatility with no overreaching guidance or principal direction. His landing in Minnesota reflects this uncharted course, Mr. Wolfe fell asleep in their car and recalls waking up in Illinois with M. telling him they were on their way to Minnesota. So, with no forethought or planning, he arrived in Minnesota at the end of 2016, when he was 19 years old.

The end of that relationship soon followed, with Branden finding himself homeless and unemployed. He lived at the Dorothy Day Center in St. Paul, and then a youth shelter in St. Paul, where he met BH, the mother of his child. The two of them picked up where he left off with his last relationship, drifting aimlessly from place to

place, from Minnesota back to Florida, then to Mississippi, and then back to Florida, where she became pregnant, and then returning to Minnesota, where they lived in a family shelter in White Bear Lake while their daughter was born. In what would become a recurring pattern, BH left and moved to Tennessee with their daughter, and Branden eventually followed them there, and thereafter followed the recurring pattern of being reunited, fighting, splitting, moving, and living in various shelters, (Tennessee, Florida, Georgia) before following in her path back to Minnesota in early 2019.  Soon after, their daughter was placed in a quaisi-foster care program (another family cared for her) while they each were getting help, and in April of 2019, Branden, now living fully on his own, finally secured stable employment and an apartment of his own in the midway area of St. Paul, and for most of the next year had stability and income, working two jobs (security at a nightclub and bartending), and was otherwise trying to manage his life, while hoping to find a way to reunite with and provide for his daughter.

Then in March, 2020, COVID hit and both businesses he worked for closed, and he was unemployed and isolated again.  This brought on a new wave of loneliness, isolation, depression, drinking, and marijuana use.  In May, he got a job working security at Menard's, and this helped restore some normalcy to his life. Then George Floyd died.

Branden Wolfe heard about the killing, and watched the video, and, like many people, was aghast at what he saw.  He returned to work at Menard's on Tuesday, May 26, (the day after Memorial Day), and while at work ran into a group of young people who were talking about going down to the area and joining  up with the growing protestors. This caught Mr. Wolfe's attention, and seemed like the  appropriate thing to

do. He got off work mid-afternoon, and went down to the memorial site, the start of what would be six or seven days of involvement with what had, on Tuesday, started out as an unorganized largely peaceful protest, already involving thousands of people coming together to share their common feelings, demand justice for George Floyd, and protest the police killing. Wolfe was drawn into the remarkable event, the sense of community, the prospect of being involved in something bigger than his lonely self, and witnessing a once-in-a-lifetime event. He embraced the movement, the pull of the crowds, the group dynamics of the protesting, and the sense of belonging. And he was sincerely shocked by what he had witnessed on the video and the unnecessary brutality of George Floyd's murder.

The next few days were a blur. He stayed late into the night that first Tuesday, ended up walking home, slept a few hours, and then worked his normal shift (he usually worked from around 5:00 a.m.- 3:00 p.m.). As soon as he got off work, he rather quickly made his way back down to the protest, the greater part of which had moved to the area outside the third precinct. Wednesday was a repeat of Tuesday, although things were heating up and there were now increased confrontations with the police, and the crowd had swelled into the thousands, and stretched out over the distance from the George Floyd memorial outside Cup Foods to the third precinct. Branden absorbed himself in the event, racing around from place to place, consuming alcohol and marijuana, and getting increasingly manic. He stayed late again, got home in the early morning hours, then headed back to the scene on Thursday afternoon.

6

What happened Thursday evening is a bit of a surreal blur now in Branden Wolfe's recollection.  The protest turned increasingly violent throughout the day on Thursday, with increased tension and numerous encounters between the police and protestors.  The crowd seemed to turn its focus on the third precinct itself, which was protected by a barricade of fencing. After the sun went down and the police abandoned the building, it was only a matter of time before the barriers were torn down, and the crowd broke into the building itself. Hundreds entered into the building and looted. Including Branden Wolfe.  Then the fires began being lit.  There were dozens of them, the ATF has publicly stated there were over 40 separate fires started in the building. Branden Wolfe did not start any of them.  He recalls being in and out of the building more than once, the precise sequence of events is unclear, but he does recall ending up outside the front of the precinct station, climbing onto the ledge of the concrete monument/flagpole out front, taking his shirt off, holding an axe someone handed him, playing music on a portable speaker, dancing and cheering, trying to attached a "Black Lives Matter" flag to the flagpole, in full support of the whole crazy "event."  He was actually crying by that time, overcome with feelings, and the emotional impact of the moment.  By now, it is clear to see that he was in a full-on manic phase, high and intoxicated, rallying with the crowd. At one point he got down off the barrier, and as he walked past the entrance of the third precinct station, pushed a wooden barrel that was laying on the ground toward the entrance of the building. This was probably around 1:30-2:00 in the morning, and the inside of building itself was ablaze, and fully engulfed in flames by then.  The barrel (which was not on fire) was pushed onto a pile of burning

rubble outside the door of the precinct station, where its metal barrel rings were discovered the next day, on the ground outside the building.

The rest of the evening and the following days, like much of that evening, remain a blur. Mr. Wolfe got home late again and returned the next day and spent hours searching through the rubble of the Liquor Store across the street, determined to find a body he convinced himself lay buried in the debris of that building. He later found himself going to a one of the neighborhood churches, where he helped set up a security perimeter, to prevent looting and destruction in that area. He lost his job at Menards that weekend (due to his posts on social media), and was arrested on Tuesday morning. He was interviewed by the police several times, was polite and cooperative, eager to tell all that he had witnessed and experienced, and eventually the ATF interviewed him, during which they showed him pictures and he told them about pushing the barrel towards the entrance of the building, where it can be seen sitting in a picture on the area where he left it. (See Criminal Complaint, USA v. Branden Wolfe, 20-mj-360 HB, Par. 16).

Mr. Wolfe was detained at the Sherburne County jail after federal charges were filed. Upon his arrival, he discussed his mental state with jail medical staff, and for the first time in his life was started on a regimen of mental health medications, to control his out-of-control racing thoughts, help him sleep, and stabilize his generally chaotic mood swings. In October, he was released to the halfway house, where he has continued to reside. Following his release, he was able to see a psychiatrist, and was formally diagnosed with bi-polar disorder, and begin taking appropriate medication for his condition. He also began therapy, as well as chemical dependency treatment, and the

combined effects of the medication and therapy have brought about remarkable positive

changes for this young man.

Mr. Wolfe  is not one prone to excuses nor does he justify his behavior for his

role in the third precinct arson. He provided the following insight into his crime as noted

in the PSR:

> I acknowledge my guilt as charged to conspiracy to commit arson and
> accept full responsibility for my actions. I did push a barrel toward the burning
> building on the evening of May 28 as I admitted to in court. I wish I would not
> have done this. Since my arrest, I have been focusing my attention and efforts on
> addressing my mental health, and maintaining compliance with my medications
> and being involved in treatment and counseling, and work. This has been a very
> good thing for me, and I intend to continue on and make sure I take care of my
> mental health for the rest of my life, as I can see how that contributed to my
> participation in this offense, and has caused me issues in my life. I am making the
> best of this situation, and I understand and acknowledge that I am responsible for
> my plight and decisions, and I look forward to a having a healthy and happy future
> going forward. PSR Par. 27.

Now he faces sentencing for this serious federal offense.

### §3553(a) DISCUSSION

There are no guideline issues in this case, but those guidelines are only advisory

and the guidelines are not entitled to a presumption of reasonableness.[2] "The Guidelines

are not only **not mandatory** on sentencing courts; **they are also not to be *presumed***

***reasonable***." *Nelson v. United States,* 129 S.Ct. 890, 894 (2009) (emphasis added).

Even in pre-guidelines practice, the fact that the sentencing guideline calculations were

---

[2]  Counsel notes that although there might arguably be several grounds for traditional
"departures" in this case, counsel generally does not use the rigid traditional guideline departure
framework when advocating for a particular sentence, and counsel is not pursuing any traditional
"departures" here and is instead advocating for a just and reasonable sentence that is "sufficient
but not greater than necessary" pursuant to the factors set for at 18 USC 3553(a).

determined to be arithmetically accurate, however, still did not mean that they constituted an appropriate, reasonable, and just sentence in any case.  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  The Supreme Court has ruled emphatically that the guideline sentence is not to be presumed reasonable in any individual case and that the Court "must make an **individualized assessment** based on the facts presented" in each case.  *Gall v. United States*, 128 S.C. 586, 602 (2007).

In *Booker*, the United States Supreme Court held that the United States Sentencing Guidelines are advisory, and that District Courts must examine all factors set forth in 18 U.S.C. §3553(a) and impose a sentence that is "sufficient but not greater than necessary" to accomplish the goals of sentencing.  *United States v. Booker*, 543 U.S. 220 (2005). The triad of 2007 Supreme Court decisions made clear that Federal Courts must determine sentences based on the facts and unique circumstances of the particular case, and that the guidelines do not enjoy a presumption of reasonableness.  *Gall v. United States,* 128 S.C. 586, 602 (2007) (finding a probationary sentence, substantially outside of the guidelines, to be reasonable); *Kimbrough v. United States*, 128 S.C. 558, 570 (2007) (noting that Courts may vary from guidelines ranges based solely on policy considerations, including disagreements with the guidelines); *Rita v. United States*, 127 S.C. 2456, 2465 (2007) (holding that a District Court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations").  These

decisions "mean that the District Court is free to make its own reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough*, 128 S.C. at 577 (Scalia, J., concurring).  The "truly advisory" holding of these cases was made abundantly clear by Justice Stevens: "I trust that those judges who had treated the Guidelines as virtually mandatory during the post-Booker interregnum will now recognize that the **Guidelines are truly advisory."**  *Rita*, 127 S.Ct. at 2474 (J. Stevens, concurring) (emphasis added).

The Supreme Court has also rejected the pre-Booker mandatory guideline notion that "extraordinary circumstances are required to justify a sentence outside the Guidelines range" and rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall* at 595.  Indeed, the Court has made abundantly clear that a sentencing judge has the right to disregard the Guidelines simply because they do not agree with the Guideline sentence.  *Kimbrough*, 128 S. Ct. at 570.  As a result of these decisions, "the range of choice in sentencing dictated by the facts of the case has been significantly broadened." *United States v. Goodman*, 2008 WL 1766759 at 5 (D.Neb. 2008).

While in practice, a District Court still must calculate the advisory Guidelines range, *Gall*, 128 S.C. at 596-97, the Court must then:

> [A]fter giving both parties an opportunity to argue for
> whatever sentence they deem appropriate, the district judge should
> then consider all of the §3553(a) factors to determine whether they
> support the sentence requested by a party.  In so doing, [they] may

not presume that the Guidelines range is reasonable.  [They] must
make an **individualized assessment** based on the facts presented.

Id.  (citation and footnote omitted)(emphasis added).

In addition, in its decision in *Pepper v. United States*, 131 S.Ct. 1229 (2011), the

court reaffirmed the almost indisputable notion that rehabilitation is an extremely

important sentencing factor for any court to consider. While *Pepper* dealt with post-

sentencing rehabilitation, the underlying principle of taking rehabilitation into account in

any sentencing is solidly at the core of any sentencing decision. In the context of Mr.

Wolfe's case, the progress he has made to address the challenges presented by his mental

health condition and his demonstrated rehabilitation are exactly the kind of "individual

characteristics" that the Supreme Court has advised should be given significant

consideration in this court's sentencing decision.

Moreover, incarceration is often not appropriate for many offenders, despite the

contrary advise of the guidelines, and this is particularly true for offenders with treatable

conditions, and young offenders with minimal criminal records.  Indeed, probation is a

satisfactory and salutary outcome in many deserving cases, and is widely recognized as

an appropriate alternative to imprisonment, it is approved by statute, and the courts have

for years recognized the benefits of probationary sentences. Mr. Gall's case illustrates the

extent that a court may vary from the guidelines and impose a probationary sentence

based on reasonable factors.  In *Gall*, the Supreme Court confirmed that a sentencing

court within this circuit was well within its discretion to give a probationary sentence to a

drug conspirator with a 30 – 37 month guidelines range. 552 U.S. at 57-59.  A sentence

of probation for Gall was based in part on Mr. Gall's limited role in the conspiracy, his

minor criminal past, and his immaturity, and was done in spite of prison sentences

imposed for Mr. Gall's similarly situated coconspirators. *Id.* at 43-44.  Moreover, the

court noted that probation is not a pass on punishment.  As stated in *Gall*, offenders on

probation or supervised release are subject "to several standard conditions that

substantially restrict their liberty."  128 S.Ct. at 595.  As stated by the district court in

*Gall*:

> Any term of imprisonment in this case would be
> counter effective by depriving society of the contributions of
> the Defendant who, the court has found, understands the
> consequences of his criminal conduct and is doing everything
> in his power to forge a new life.

*Gall*, 128 S.Ct. at 593.  *Id.*

Over the past decade, sentencing courts have regularly varied from guidelines

ranges that would have called for prison time in numbers too great to list. As these cases

show, District Courts have taken to heart the Supreme Court's dictate "to impose a

sentence sufficient, but not greater than necessary, to comply with the basic aims of

sentencing" in §3553(a).  *Rita v. United States*, 127 S.Ct. 2356, 2463 (2007).  Numerous

cases from the early post *Gall-Booker* era illustrate the now undisputed authority of

district courts to impose probationary sentences in appropriate cases and that

imprisonment often is not the right sentence (the cases were then being appealed by the

government in their post-*Booker* resistance to the subsequent non-binding advisory

guideline regime,  a practice which has virtually stopped). Todd Miller became involved

in a drug conspiracy to distribute cocaine on the Indian Reservation. His guideline range was 37 to 46 months. This Court imposed a sentence of three years' probation with twelve months home confinement, based on his combination of individual achievements and sentencing factors including that he presented little risk of danger to the public, he had a difficult childhood, he had accepted full responsibility for his actions, he had one child at home and another on the way, the court believed the public would benefit from keeping Miller at home with his children, and Miller had the family support to assist him in remaining law-abiding and making appropriate decisions for himself and his family. The court emphasized that it had taken all of these factors into consideration, placing particular significance on Miller's achievements since his arrest and determined that a sentence of three years' probation was reasonable. *United States v. Miller,* 484 F.3d 964, 965-66 (8th Cir. 2007), cert. granted and judgment vacated in consideration of *Gall, Miller v. United States,* 552 U.S. 1089 (2008).

Tina Lynn Burton possessed pseudoephedrine with the knowledge it would be used to manufacture methamphetamine. Her guideline range was 37 to 46 months imprisonment. The District Court sentenced her to three years' probation finding that she 1) had never been in jail before; 2) became involved with methamphetamine late in life; 3) changed her life around; 4) got help for her drug problem; 5) helped others through valuable work; and 6) the Court did not think she would relapse into a criminal lifestyle. "The District Court found that imprisoning Burton would not further sentencing objectives of deterrence, incapacitation, and punishment and that a sentence outside the Guidelines range was reasonable." *United States v. Shy,* 538 F.3d 933, 936 (8th Cir.

14

2008).  After considering the §3553(a) factors and her rehabilitation, the Court sentenced her to three years' probation.  *Id*.

Mario Alberto Bueno pled guilty to possession with the intent to distribute five kilograms of cocaine.  His guideline range was 37 to 46 months.  The District Court originally varied from the guideline range based on the health of his wife, and sentenced him to 18-months imprisonment, and after the government appealed and the Supreme Court's decision in *Gall,* the District Court sentenced him to a term of five years' probation with house arrest.  *United States v. Bueno,* 549 F.3d 1176, 1180 (8th Cir. 2008).  The Eighth Circuit affirmed the sentence. *Id.*

As these cases show, and there are now thousands of them throughout the country, District Courts have taken to heart the Supreme Court's dictate "to impose a sentence sufficient, but not greater than necessary, to comply with the basic aims of sentencing" in §3553(a).  *Rita v. United States,* 127 S.Ct. 2356, 2463 (2007).  Incarceration is simply not necessary in every case.  Indeed, many of the cases above warranted probationary sentences in cases with guidelines in line with those found in this case. But the guideline ranges involved are not the point or even a particularly valid reason to impose or not impose a probationary sentence.  The overall sentencing calculus, as demonstrated by the thoughtful analysis put forth by the various courts above, is what matters.  This includes a careful examination of the facts of the case before the court, as well as the "individual characteristics of the defendant."

15

In this case, we are dealing with a unique and unusual arson case. This case is an anomaly, an outlier of an arson case, as it relates to Mr. Wolfe, and his role and participation in this fire, and an aberrant act of behavior. In the old pre-*Booker* guideline parlance, his case certainly falls outside of the "heartland" of federal arson cases. The third precinct was fully engulfed in flames before he pushed the barrel into a pile of rubble outside the precinct station. His actions at that moment were unplanned, unsophisticated, and spontaneous. Indeed, there was no planning on his part, advance warnings, or forethought that he was going to do anything illegal that evening, other than a continuation of the prior two evenings of peaceful protesting. He did not light any fires inside the precinct station, or cause the fire, the barrel itself wasn't set ablaze or burning when he left it. He did not bring fire starters or ignitables to the scene, his case does not involve the use of "accelerants." Certainly, Mr. Wolfe's pushing of the barrel into the fire, while joining him to the conspiracy, is outside the heartland of cases contemplated by the guidelines, and can be easily seen as an outlier case and an anomaly. This crime was also not motivated by greed, seeking violence towards another person, an effort to obtain insurance proceeds, or other features common to federal arson cases. It is a unique and unusual case.

Mr. Wolfe's individual characteristics warrant consideration for a probationary sentence. Hopefully of greater concern and consideration here should be a recognition of the contribution his undiagnosed and untreated mental health problems had in his actions that evening, and in the days leading up to and after this event. This is neither an excuse or justification; Mr. Wolfe, despite his difficulties, certainly knows right from wrong, and

his mental health issues do not excuse him from responsibility for his actions.  That is not the point.  The critical observation as it relates to sentencing, is that this is a young man whose behavior should be gauged through the lens as someone with a treatable condition such that this behavior is preventable and not likely to be repeated.  He is neither a psychopath nor a sociopath.   He had unfortunately never received either a proper diagnosis or needed medication before his arrest in this case.  This incident, resulting in his arrest and incarceration, has been of immense benefit to him. He initially reached out for help at the jail, and was started in on a regiment of medication, for the first time in his life.  This has been of immense benefit to him. He also started sleeping regularly, eating regular meals, and adhering to the formality of a schedule, another benefit. Since his release to the halfway house, he has also been in regular individual therapy, a positive experience.  In short, this is young man with a treatable condition who is receiving much needed and welcomed treatment, therapy, and medication, all of which he has embraced and fully accepts, indeed he is grateful for the help he has received.  As to him, this case isn't so much about the barrel pushing as finally trying hard to get over the chaos in his life; if it hadn't been this incident, it would have been some other event.   He is grateful to be finally diagnosed as bi-polar and taking affirmative steps to learn to live with that disorder. Indeed, his future prognosis looks good.

Moreover, Mr. Wolfe is not someone who has led a life of crime or otherwise become entrenched in criminal behavior or a criminal lifestyle.  Indeed, his prior legal problems have involved relationship issues, which, in retrospect, are probably in large part attributable to his undiagnosed and untreated mental health issues, as well as

immaturity, and the general chaos caused by years of homelessness, living in shelters, and general lack of stability, all of which he is learning to overcome.  He also has not experienced previous incarceration, and the several months he spent at the Sherburne County jail were by far his longest term of incarceration, so the notion of incremental punishment warrants some consideration whether he should be now be sent to prison for a number of years for further deterrence purposes.

In addition, the court should note Mr. Wolfe's overall cooperative attitude with law enforcement officials involved in his case, his acceptance of responsibility, and his general overall positive attitude in dealing with this matter.  He is extremely remorseful for what he did and has fully accepted responsibility for his role in this crime, and he is working hard to deal with his mental health problems, and make life style changes necessary to lead a productive and fulfilling life.

In sum, sending Mr. Wolfe to prison would be a sentence "greater than necessary" to satisfy the purposes of sentencing, and a sentence of probation with a number of conditions, including continued residence at a residential reentry center, house arrest, community service, and restitution, would be appropriate in this case. Moreover, sending Mr. Wolfe to prison would be "counter effective"  to his rehabilitation and recovery. Mr. Wolfe is at heart a good person who committed a crime and what he did was wrong but he tried to do the right thing here by owning up to it, pleading guilty, and making life changes. The law enforcement purposes of sentencing are more than satisfied by a probationary sentence in this case – including promoting respect for the law, and providing deterrence to others – while taking into account the individual characteristics of

Mr. Wolfe.  As Judge Rakoff has observed, there is a fundamental reason that courts are asked to review the entire circumstances of a person's life in determining an appropriate sentence:  "[I]n determining the appropriate punishment here, if ever a man is to receive credit for the good, he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'"  *United States v. Adelman*, 441 F. Supp.2d 506, 513-514 (S.D.N.Y. 2006).

The sentencing analysis here must start with an examination of who Branden Wolfe is as unique individual appearing before the court on what is essentially his first serious criminal offense.  A sentence of probation, with appropriate community sanctions, including a requirement that he reside in a residential re-entry center and perform significant community service, is an appropriate sentence in this case.  The guidelines advise a sentence that is "greater than necessary" for this 23-year-old  offender to comply with the purposes of sentencing under 18 U.S.C. §3553(a).  A felony conviction and a sentence of probation with substantial community service is still a punitive sentence and it will satisfy all the purposes of sentencing.  It is so requested.

Dated:   April 16, 2021                     Respectfully submitted,

                                            *s/ Douglas Olson*

                                            _____

                                            Douglas Olson
                                            Attorney ID No.  169067
                                            Attorney for Defendant
                                            107 U.S. Courthouse
                                            300 South Fourth Street
                                            Minneapolis, MN 55415