```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2
    -----------------------------------------------------------
3                                       )
     United States of America,          )   File No. 20-cr-181
4                                       )              (PJS/BRT)
              Plaintiff,                )
5                                       )
     v.                                 )   Minneapolis, Minnesota
6                                       )   May 4, 2021
     Branden Michael Wolfe,             )   9:00 a.m.
7                                       )
              Defendant.                )
8    -----------------------------------------------------------

9            BEFORE THE HONORABLE PATRICK J. SCHILTZ
               UNITED STATES DISTRICT COURT JUDGE
10                        (SENTENCING)

11   APPEARANCES
      For the Plaintiff:         U.S. ATTORNEY'S OFFICE
12                               HARRY JACOBS, AUSA
                                 DAVID STEINKAMP, AUSA
13                               300 S. 4th St., #600
                                 Minneapolis, Minnesota 55415
14
      For the Defendant:         OFFICE OF THE FEDERAL DEFENDER
15                               DOUGLAS OLSON, PDA
                                 300 S. 6th St., #175
16                               Minneapolis, Minnesota 55415

17   Court Reporter:             DEBRA K. BEAUVAIS, RPR-CRR
                                 300 S. 4th St., #1005
18                               Minneapolis, Minnesota 55415

19

20

21       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
22

23

24

25
```

1    **P R O C E E D I N G S**

2    **IN OPEN COURT**

3           THE COURTROOM DEPUTY:  All rise.  United States

4    District Court for the District of Minnesota is now in

5    session, the Honorable Patrick J. Schiltz presiding.

6           THE COURT:  Good morning.  Please be seated.

7           We are here this morning for sentencing in the

8    case of United States of America v. Branden Michael Wolfe.

9    The case is Criminal No. 20-0181.

10          If I could have the attorneys make their

11   appearances, please, beginning with the prosecutors.

12          MR. JACOBS:  Harry Jacobs on behalf of the United

13   States.  Good morning, Your Honor.

14          THE COURT:  Good morning, Mr. Jacobs.

15          MR. STEINKAMP:  Good morning, Your Honor.  David

16   Steinkamp also on behalf of the United States.

17          THE COURT:  Good morning, Mr. Steinkamp.

18          MR. OLSON:  And Doug Olson with the Defender's

19   Office on behalf of Mr. Wolfe, who is present and with me

20   here today.

21          THE COURT:  And good morning to both of you.

22          Mr. Wolfe previously pled guilty to conspiracy to

23   commit arson.

24          Mr. Jacobs, has the government received a copy of

25   the PSR and the addendum?

1              MR. JACOBS:  We have, Your Honor.

2              THE COURT:  And you have no objections; is that

3       correct?

4              MR. JACOBS:  No objections, Your Honor.

5              THE COURT:  All right.  Mr. Olson, have you and

6       your client received copies of the PSR and the addendum?

7              MR. OLSON:  Yes, Your Honor.

8              THE COURT:  And have you read and discussed those

9       documents?

10             MR. OLSON:  Yes.

11             THE COURT:  And you, too, have no objections; is

12      that correct?

13             MR. OLSON:  That's correct.

14             THE COURT:  All right.  I adopt as the findings of

15      this Court all of the factual statements in the PSR.

16             In terms of sealed documents, Mr. Olson, I think

17      we've just got the letters that were submitted by and on

18      behalf of Mr. Wolfe.  I didn't see anything particularly

19      sensitive in those letters.  It's very similar to the

20      position paper that you filed.  Is there any reason we have

21      to keep those sealed?

22             MR. OLSON:  I'd ask that they be sealed.  I get a

23      little bit concerned about the press printing a mother's

24      letter and/or his personal letter to the Court.

25             THE COURT:  How about if I seal them for five

1    years to get them past the time when anybody would be

2    interested in them?

3              MR. OLSON:  That would be fine, Your Honor.

4              THE COURT:  That's what we'll do, then.  We'll

5    seal those for five years.

6              Next is the issue of restitution, which I want to

7    address.  I've read the parties' briefs on restitution.  Is

8    there anything that anybody wants to add to what's in the

9    written papers?  Mr. Olson, did you want to say anything

10   more on the issue of restitution?  If you want to stay

11   seated, Mr. Olson, that's fine given the --

12             MR. OLSON:  Just getting back to being a lawyer

13   again.

14             THE COURT:  Well, I'm getting back to being a

15   judge.  I get that.

16             MR. OLSON:  Nothing further than what I submitted.

17   I mean, the Court made a ruling last week and I understand

18   that, so I had not addressed the issue so I did set forth my

19   simple position, which I think is kind of almost

20   self-sufficient statement in the restitution pleading I

21   filed on Friday, and I'll rely on that.

22             THE COURT:  All right.  And we did, obviously,

23   spend a lot of time researching and looking at this issue.

24   I might be wrong about it, but you've preserved your rights

25   on it and I'll explain my view.

1          MR. OLSON:  Which is all I was intending.

2          THE COURT:  I understand.

3          Mr. Jacobs, anything you wanted to say on the

4    issue of restitution?

5          MR. JACOBS:  No, Your Honor.

6          THE COURT:  Okay.  Let me just dictate a ruling on

7    restitution so that the record in this case is complete.

8          The parties have agreed that the mandatory Victims

9    Restitution Act, 18 U.S.C. Section 3663, applies and that

10   the loss amount to the victim of Mr. Wolfe's crime, which is

11   the City of Minneapolis, is $12 million.  Mr. Wolfe

12   contends, however, that he should be required to pay just

13   1/1000th of that amount, or $12,000, in restitution.

14         Mr. Wolfe reasons that because his involvement in

15   the destruction of the Third Precinct was limited to pushing

16   a wooden barrel into an existing fire and because he did not

17   start any fires himself, ordering restitution in the amount

18   of $12,000 would be "fair and proportionate" under the

19   circumstances.  In support of his argument, Mr. Wolfe cites

20   *Paroline v. United States*, 572 U.S. 434, a child-pornography

21   case in which the Supreme Court held that "restitution is...

22   proper under 18 U.S.C. Section 2259 only to the extent the

23   defendant's offense proximately caused a victim's losses."

24   In this case, Mr. Wolfe argues the losses "proximately

25   caused" by his actions were "minimal, as should the losses

1    attributed to him for restitution purposes."

2              I do not agree with Mr. Wolfe's argument.

3              I'm required by 18 U.S.C. Section 3664(f)(1)(A) to

4    "order restitution to each victim in the full amount of each

5    victim's losses as determined by the court and without

6    consideration of the economic circumstances of the

7    defendant."  Section 3664(h) provides that courts have

8    discretion to either "make each defendant liable for payment

9    of the full amount of restitution" or "apportion liability

10   among the defendants to reflect the level of contribution to

11   the victim's loss and economic circumstances of each

12   defendant."  But a court may not award less than the full

13   amount of the loss caused by the offense of conviction.

14             Mr. Wolfe argues that under *Paroline*, the Court

15   can disregard the statutory mandate and instead order

16   restitution commensurate with his limited role in the

17   conspiracy.  I do not agree with his interpretation of

18   *Paroline*.

19             *Paroline* concerned the question of how to order

20   restitution in the case of a defendant convicted of

21   possession of child pornography.  The issue was difficult

22   because of what the Supreme Court called the "somewhat

23   atypical causal process underlying the losses" to the

24   victims of child pornography.  The defendant in *Paroline* was

25   one of thousands -- probably tens or hundreds of thousands

1    -- of people who viewed the images of the victim.  Thousands

2    of people viewed those images before the defendant, and

3    thousands would view those images after the defendant, as

4    they would be available on the internet forever.

5            On the one hand, the fact that many thousands of

6    people had viewed and would continue to view images of the

7    victim's sexual abuse caused her grievous and ongoing harm.

8    On the other hand, the fact that a particular defendant

9    viewed images of the victim's sexual abuse did not cause her

10   any marginal harm.  In other words, the amount of harm

11   caused by the victim's knowledge that people were looking at

12   the images would be exactly the same whether the number of

13   viewers was 99,999 or 100,000 or 100,001.

14           In light of the "atypical causal process" between

15   the crime of possession of child pornography and the harm it

16   causes to victims, the Supreme Court said the following:

17               "In this special context, where it can be

18               shown both that a defendant possessed a

19               victim's images and that a victim has

20               outstanding losses caused by the continuing

21               traffic in those images but where it is

22               impossible to trace a particular amount of

23               those losses to the individual defendant by

24               recourse to a more traditional inquiry, a

25               court applying 18 U.S.C. Section 2259 should

1          order restitution in an amount that comports

2          with the defendant's relative role in the

3          causal process that underlies the victim's

4          general losses."

5      For several reasons, I do not agree with Mr. Wolfe

6  that, under *Paroline*, he should not be held liable for more

7  than $12,000 to the City of Minneapolis.

8      First, the Supreme Court explicitly confined its

9  holding in *Paroline* to the "special context" of

10 child-pornography offenses.  The harm caused by arson is

11 nothing like the harm caused by possession of child

12 pornography.  The damage caused by an arsonist is not

13 ongoing, it does not grow over time as additional arsonists

14 continuously contribute to the total loss suffered by the

15 victim.  Rather, the fire is extinguished and a fixed loss

16 amount is calculated.  The damage caused when multiple

17 people join together to burn a building is not the type of

18 "atypical causal process" with which *Paroline* was concerned.

19 Rather, the damage caused when multiple people joined

20 together to burn a building is like the damage caused when

21 multiple people join together to rob a bank or defraud an

22 insurance company.  In such cases, the defendants are almost

23 always held jointly and severally liable for the full amount

24 of the victim's losses, even though the victim's losses

25 would have been the same if any one defendant had not

1   participated in the crime, and even if not all the

2   perpetrators have been identified.

3          Second, although the PSR suggests that there may

4   have been 1,000 or more people gathered outside of the Third

5   Precinct on the evening of May 28th, 2020, that does not

6   mean that all 1,000 protestors participated in the burning

7   of the Third Precinct.  To the contrary, many people in that

8   crowd were urging the mob of which Mr. Wolfe was a part to

9   remain peaceful and not to attack the building.  Thus,

10  Mr. Wolfe was not like Doyle Paroline and other possessors

11  of child pornography, one of many thousands of perpetrators

12  causing harm to a single victim.

13          And, finally, Mr. Wolfe overlooks the fact he has

14  been convicted of *conspiracy* to commit arson.  The

15  conspiracy of which Mr. Wolfe was a member included not just

16  him and not just his three indicted co-conspirators; rather,

17  it included all of those -- indicted and unindicted -- who

18  conspired to burn the Third Precinct.  As the Ninth Circuit

19  explained in *United States v. Grovo*, 826 F.3d 1207,

20                  "*Paroline* did not abrogate the longstanding

21                  rule that a defendant convicted of a

22                  conspiracy is liable for restitution for not

23                  only those harms resulting from the

24                  defendant's individual actions, but also

25                  others caused by the conspiracy itself.

1              Indeed, *Paroline* expressly distinguished cases

2              in which wrongdoers act in concert with each

3              other, and derived its proximate causation

4              rule from a statutory provision requiring

5              restitution for any losses suffered by the

6              victim as a proximate result of the offense.

7              When the offense is conspiracy, *Paroline*

8              requires restitution for any losses

9              proximately caused by the conspiracy -- not

10             those caused by the individual defendant."

11        For these reasons, I'm not persuaded by

12   Mr. Wolfe's argument that he should be required to pay only

13   $12,000 in restitution to the City of Minneapolis.  Instead,

14   I will order him to pay the full amount of the City's loss.

15   I've already ordered that Dylan Robinson be held jointly and

16   severally liable for that amount, and I will likely order

17   that Mr. Wolfe's other co-defendants be held jointly and

18   severally liable as well.  Of course, I recognize that,

19   unless Mr. Wolfe wins the lottery, he will end up paying

20   only a tiny fraction of that loss.

21        All right.  Mr. Jacobs, do you want to move for

22   the additional one-level reduction for acceptance?

23        MR. JACOBS:  We do, Your Honor.

24        THE COURT:  That motion is granted, and I

25   determine the guidelines apply as follows:  The total

1    offense level is 21.  The criminal-history category is II

2    with three points.  The imprisonment range recommended is

3    between 41 months and 51 months in prison.  The supervised

4    release range recommended is 1 to 3 years.  The fine range

5    15,000 to $150,000.  And the special assessment $100.

6              Mr. Jacobs, does that sound correct to you?

7              MR. JACOBS:  It does, Your Honor.

8              THE COURT:  And Mr. Olson?

9              MR. OLSON:  Yes, Your Honor.

10             THE COURT:  My understanding is that neither side

11   is moving for a departure under the guidelines.  I do

12   understand that the defendant is seeking a variance under

13   3553(a).  Is that correct on the government's side,

14   Mr. Jacobs?

15             MR. JACOBS:  Yes, Your Honor.

16             THE COURT:  And, Mr. Olson, on your side?

17             MR. OLSON:  That's correct.

18             THE COURT:  Okay.  Mr. Olson, let me then invite

19   you to say whatever you would like on behalf of Mr. Wolfe.

20   If you want to come to the podium for this, that's fine with

21   me.

22             MR. OLSON:  Does my mask stay on?

23             THE COURT:  Are you fully vaccinated?

24             MR. OLSON:  Yes.

25             THE COURT:  Then you can take your mask off.

1        MR. OLSON:  Thank you.

2        THE COURT:  Not a question that I had asked people

3   for the first 15 years of my career, but --

4        MR. OLSON:  Not a question I ever asked a judge,

5   if I could take my mask off.  Good to see everybody.  Good

6   to be back.

7        As to Mr. Wolfe, you know, I'm not going to give a

8   big speech here.  I've submitted a position paper outlining

9   a lot of the circumstances surrounding Mr. Wolfe -- his

10  background, his involvement in this offense, and what my

11  recommendation was for sentencing.  But I'm not going to

12  spend a lot of time just rehashing that.  The Court knows my

13  position.  I may alter that a little bit as we go forward

14  here.

15       But what I do want to say about Mr. Wolfe and what

16  I want the Court -- and I think the Court can sincerely

17  understand this -- is that he certainly has had his

18  difficulties, and he sincerely suffers from a form of mental

19  illness -- bipolar disorder, which we used to call manic

20  depressive.

21       And, you know, when I first saw him as a client,

22  and which was only a few days after he was arrested and he'd

23  become in the federal custody, I mean, I'm talking about

24  somebody that was in a full manic phase.  And you could kind

25  of see the thought process, the scatter-brainedness of the

1    difficulty he had focusing on things and how it was driving

2    his thinking and how it had driven his behaviors in the

3    past.  And I'll get back to that in a little bit, but if you

4    look at what -- his form of mental illness, which goes back

5    -- it may go back to a brain injury at his birth, but he's

6    had troubles throughout his childhood and all of his life in

7    the form of some forms of mental illness, which have made

8    him different.  He's felt different, and he has been

9    different, and it's affected his behaviors particularly --

10   if you look at these couple of years, he quits -- he quits

11   high school.  He quits home-schooling; I'll just leave that

12   alone.  And he starts wandering around the country basically

13   following one and then another girlfriend around in what now

14   I can recognize, and I think he recognizes, in a bit of

15   manic disorder and just complete and utter chaos without

16   really a goal or a purpose in life, other than kind of

17   following the next thing -- the next energy that presents

18   itself, the next circumstance, ultimately leading into a

19   bizarre trail that just lands him in Minnesota by

20   happenstance one day.  And here he's been for the last few

21   years dealing with homelessness.  His life is characterized

22   by homelessness and living in shelters.  And that was the

23   life that he had -- that's the life that he was dealing

24   with.

25              And I think that you don't have to be well-versed

1    in psychiatry to see you have somebody who has some pretty

2    significant mental-health issues going on in his life,

3    inability to kind of focus and control and do what other

4    people would view as more normalized behaviors.

5           But going forward, in the aftermath of his -- and

6    I'll talk about the offense a little bit later on, but

7    that's not really my focus here.  In the aftermath of him

8    getting arrested and me talking with him and getting to know

9    him as a person, you know, he knew that he was troubled.  I

10   mean, he has had enough interaction with mental-health

11   problems, and growing up particularly, that he knew that he

12   needed help and direction.  I mean, he had previously been

13   committed, I think, for a short term about a year previously

14   at the University of Minnesota.  So he knew he had problems.

15          He reached out to the jail staff about his racing

16   mind, his problems, and his mental-health issues.  He

17   couldn't sleep, and he couldn't focus.  I give the jail a

18   lot of credit.  And I'm not a guy that gives the jail a lot

19   of credit, because I've had nothing but problems with jail

20   for most of my career, particularly dealing with undiagnosed

21   mental-health issues, because they usually just -- well,

22   that's just part of the problem.  But they helped him, and

23   they helped him quite a bit.  They put him on medication.

24          And I could see the results within a week or two

25   about how it had changed him and affected him.  And he

1   started working on his own self-help with the medication

2   trying to get a regular -- just a regular -- things that we

3   take for granted -- sleeping a regular night's sleep,

4   getting up in the morning, exercising, eating regularly.

5   All of these things were significant life-changing events

6   for him given his previous history.  And he started kind of

7   putting his mind back into some kind of framework of order

8   and including dealing with this offense.

9           You know, when he was interviewed, you know, he

10   was interviewed right away by the St. Paul police and the

11   ATF; quite an engaging young man.  And he was more than

12   willing to talk.  He was quite honest and open about

13   everything.  They asked him about it.  They showed him his

14   picture at the bureau, and he said, well, I picked that up

15   and put it there.  That's the arson here.  They came back

16   and talked with him; very polite, you know.  And I'm quite

17   sure that if you asked the ATF people they would acknowledge

18   the same -- the manic, scatter-brained, flow of

19   consciousness thinking that we were dealing with here.

20           But as things progressed, you know, he got better

21   with the medication, he started focusing in.  And then we

22   got him released to the halfway house, he finally got to go

23   see -- a formal counselor got involved and he got to see a

24   psychiatrist.  The psychiatrist then changed and put him on

25   the appropriate anti-psychotic bipolar medications.  He

1    started in on therapy.  And that has been a godsend to him,

2    and it's changed him.  It's changed and altered the course

3    of his life.

4          And most recently, the last couple months, he's

5    been doing chemical dependency treatment as well, all of

6    which has been positive and helpful for him.

7          So the person that the Court sees here is very

8    much different than the person that was standing on that

9    building out there with his boom box, waving his hand,

10   jumped down from a concrete flag poll and pushed a barrel

11   towards the fire.

12         He's remorseful.  He is embarrassed about what he

13   did.  He's ashamed of himself.  The Court said, yeah, there

14   were a thousand people there but not everybody -- he knows

15   he was on the wrong side of all of that.  It was wrong

16   behavior.  He recognizes it.  He's sorry for what he did.

17   And the things he said both in his letter to the Court and

18   his acceptance of responsibility are sincere and heartfelt.

19         I was just talking with him.  I've spent an

20   enormous amount of time with him in part because he needed

21   it, in part because I think that it was good for him.  And I

22   wanted to make sure that I could figure out what was going

23   on with him and share his story accurately.  But he's

24   thankful that he got the help that he needs.  It's too bad

25   that it took this to get there.  So he is very thankful

1    about the opportunities he has had.

2            He's ashamed and sorry for what he did.  And he

3    views his future differently because he can see some

4    purpose, he can see some hope, and he sees some long-term

5    optimism coming out of all this given that he is in a much

6    better mental state in terms of dealing with the world and

7    dealing with the chaos in his mind.

8            Now, everything hasn't been all smooth and dandy

9    with him.  I mean, he's had nothing but rules violations at

10   the halfway house.  We'll get to that later.  But life isn't

11   particularly simple or easy for him on a lot of levels.  But

12   the point of all this is that he's doing much better, he's

13   in a much better position now that he's being treated for

14   his bipolar disorder in therapy and learning how to do that.

15           And he recognizes that this is a lifetime struggle

16   he is going to have.  Life isn't going to be easy for him.

17   He's going to have to take medication the rest of his life.

18   He knows that.  He is going to have to engage himself in

19   therapy and counseling maybe the rest of his life, but it's

20   going to be an ongoing thing.  He is only less than a year

21   into dealing with all this.  This takes years to get there.

22   But he is working on it hard.  And he really does mean well,

23   and he's sincere in the things that he says.  And when he

24   says that he is thankful for the intervention in his life,

25   he means it.  And it's not just something that he's throwing

1    out there to try and get a better sentence.

2           Now, as to sentencing -- and I've set forth my

3    position about a probationary sentence and not sending him

4    and people like him to prison, but I'm not going to harp on

5    that.  I think the Court can decide what it needs to do

6    here.  And I would suggest, though, that maybe the Court can

7    move the guideline numbers down a bit.  I suggest that

8    there's nothing to be served in this case by a sentence that

9    was -- 24 months would do everything that a sentence 42

10   months would serve, which is what the government is asking

11   if the Court is rejecting my position on a probationary-type

12   sentence.

13          I think that there is some question of

14   proportionality in terms of what he actually did here in

15   pushing of the barrel, his lack of preplanning, and lack of

16   actually starting the fire, and all these kinds of things

17   I've kind of laid out there.  But that's not really what I

18   stood up here to talk about.

19          I just wanted to say on his behalf that whatever

20   happens here, he's never whined about it.  He's been

21   responsible from day one.  The ATF agents were happy.  They

22   went and talked with him.  They came back and they talked

23   with him several times.  They were happy with him.  The

24   government was happy.  He worked out a deal right away, I

25   think the first of all the people that might have pled

1    later, but we worked out a deal right away.  He was very

2    cooperative with everybody.  He has not ever dodged his own

3    responsibility for what he did that night and his

4    participation in that whole affair was wrong.  He knows it,

5    and he has owned up to it.

6         I think that going forward here he will be able to

7    eventually adjust to a normal life.  He will take his

8    medication.  He will engage in counseling.  He will continue

9    to work on the things that he needs to.  Like I said, he's

10   only nine months into that lifetime journey, but he's in a

11   much, much better position and state of mind here today than

12   he was when he committed this offense nearly a year ago.

13        So I'd ask the Court to take all that into

14   consideration, treat him with some compassion, think about

15   those things.  And if the Court rejects my probationary

16   request, consider whittling down the government's 42-month

17   request a bit on his behalf.

18        Thank you.

19        THE COURT:  Thank you, Mr. Olson.

20        Mr. Wolfe, did you want to say anything this

21   morning?

22        THE DEFENDANT:  Your Honor, the only thing I can

23   really say is that my letter doesn't really reflect -- words

24   -- the downside of words is that they never on paper can

25   reflect what the heart and mind truly feel.

1              And just yesterday I actually was speaking to my

2      treatment counselor about how in the beginning I deflected

3      accountability for my actions citing that I was intoxicated

4      and, you know, it was a split-second decision.  And I

5      realized that even though I was saying, okay, yes, I made

6      that choice, I was still deflecting the accountability.

7      And, you know, I just realized that yesterday, after nine or

8      ten months after the event.  But with that, I'm excited and

9      I'm looking forward to the ability to actually start working

10     on that process of learning to truly take accountability for

11     my actions.

12             You know, I respect any decision that this Court

13     makes.  And I just -- I really look forward to whether term

14     of imprisonment -- when I get out, and during that time just

15     focusing on really bettering myself so I can be a better

16     person for society and just for myself in general.

17             I do have a three-year-old daughter, and I accept

18     the fact that due to my actions, I will probably never have

19     a close bond with her until she's an adult.  And I don't

20     want to be 18 years from now her seeing me as a man that

21     never did anything with himself, that never got himself

22     together, that just kept following the same path that he has

23     been that caused me to lose the opportunity to raise her.

24     And that is my biggest motivation to really better myself as

25     a person so that I can say, Hey, Alana, I made really bad

1    choices, I went down a really bad path, and I neglected a

2    lot of things, including you.  But since then I've learned

3    how to take accountability and to really work on being

4    better and making a better life for myself.  And that is

5    really all that I can say, Your Honor.

6              THE COURT:  All right.  Thank you, Mr. Wolfe.

7              THE DEFENDANT:  Thank you.

8              THE COURT:  Mr. Jacobs, I understand you have a

9    couple people here that would like to address the Court as

10   well.  They can do it before you or after you, however they

11   want to do this.

12             MR. JACOBS:  Your Honor, I will let them speak

13   before me if that's --

14             THE COURT:  All right.

15             Good morning.  If I could have you just state your

16   initials so we can identify you on the record in that way,

17   and I'd be happy to hear anything you have to say.

18             VICTIM WITNESS CN:  CN.

19             THE COURT:  All right.

20             VICTIM WITNESS CN:  And I have been fully

21   vaccinated so can I remove the mask?

22             THE COURT:  Yes.

23             VICTIM WITNESS CN:  Thank you.

24             Honorable Judge Schiltz, for the past 25 years I

25   have worked as a civilian employee for the Minneapolis

1   Police Department.  I have had the privilege of being

2   assigned to the Third Precinct for over half of those years.

3           The entire neighborhood that is served by the

4   Third Precinct is affectionately called the south side of

5   Minneapolis.  The Third Precinct was not just a public

6   service building but an integral part of our community.

7           It's difficult to use past tense words like was,

8   as it implies that the building is dead and I know

9   metaphorically it is.  Like a young adult dying too soon,

10  the building was only about 35 years old.  It is now a

11  ravaged corpse.  So, too, like a deceased family member,

12  stories of what used to be are slowly being shared by

13  community members and employees like myself.

14          Each May the precinct hosted an annual open house

15  for school children to have a fun free lunch with McGruff.

16  Our mounted units stopped by and inner city kids who've

17  never petted a horse would like up for that.  Youth would

18  then clutch their tickets to see who would win a free bike

19  that officers had secured for them.

20          There was a small community room in the front of

21  the building where many a court-ordered visitation between

22  parents and vulnerable children would safely meet.

23          The larger community room hosted many supportive

24  retirement parties with community members and MPD employees

25  at the end of their careers, some careers cut short due to

1    illness or cancer.

2         A little, free library greeted everyone at the

3    precinct's front door.

4         This was not just a building but an integral part

5    of our south side community.  I say "our" for I live less

6    than two miles from the precinct.  I drive by the old

7    precinct routinely as a south-sider.

8         I will never forget the night of mayhem, carnage,

9    and destruction as I watched in horror fixated on a live

10   feed online media program.  There I saw in full view

11   jackals, dingoes, and street dogs desecrating the precinct

12   and trying to burn it to the ground.  I shook and screamed

13   in my house, sobbing uncontrollably as my beloved precinct

14   was attacked.  I use the words "jackals, dingoes and street

15   dogs" as I didn't recognize anyone being in human form as

16   they ran in and out of the building.

17        It has been a personal challenge to live with the

18   aftermath of the destruction of the Third Precinct.  I

19   couldn't leave my house for two weeks last summer after this

20   incident and had a neighbor bring me groceries.  I stay up

21   half the night with the lights on fearing that I would

22   somehow be attacked.  The image of the burning building

23   still blazes in my mind's eye.  All summer long I forced

24   myself to go to the farmer's market held nearby in an open

25   lot by the former precinct.  Often I would just stand aside

1   weeping from the mindless destruction that took place.

2          I cannot fathom what kind of deranged minds could

3   conduct themselves in such a manner to blow up a public

4   service building.  I hope the Sentencing Guidelines are

5   implemented by the Court.

6          From time to time I see some of my co-workers who

7   worked that night in threes.  They look shell-shocked, like

8   soldiers from war movies.  I see and can hear how their

9   disassociation impacts their lives, once vibrant people now

10  looking like zombies with pain seared on their faces as they

11  try to walk forward.

12         I'm grateful there wasn't any physical loss of

13  life of any of the MPD officers or civilians that night;

14  however, it's too soon to say what the long-term affects

15  will be on any of us who lived through that carnage.

16  Emotionally and psychologically it takes longer to heal from

17  attacks against our personhood than broken bones.

18         I trust that law and order will prevail.  I pray

19  that justice is served.  It will be a start, like a balm,

20  that helps those of us who live with the aftermath of the

21  destruction of the Third Precinct.

22         Thank you.

23         THE COURT:  Thank you.  Thank you.

24         Good morning, Ma'am.  If you could just give us

25  your initials as well, please.

1          VICTIM WITNESS KL:  Good morning.  My initials are

2     KL.

3          THE COURT:  All right.  What would you like to say

4     this morning?

5          VICTIM WITNESS KL:  Thank you.  So often police

6     officers are not heard.  I've been a police officer in the

7     State of Minnesota for 37 years, and this event pushed me to

8     retire.

9          I've never cared if anybody respected me as a

10    person.  That was never why I was wearing the uniform.  I

11    wore the uniform because it was a symbol and it was a symbol

12    that people needed to respect.

13         The building that we lost that day, my office was

14    on the second floor of that building.  I went in the next

15    day and it was totally destroyed.  My office was melted.

16    Everything I had in that office was gone.  I took out when I

17    left what I could of personal belongings.  But I'm not

18    telling you this because of things that I personally lost --

19    possessions -- but what the community lost and what we, as

20    police officers, lost.  We lost something that was just

21    referred to as bricks and mortar, but it was more.  It was

22    more to the community, and it was more to the officers that

23    worked there.  That was home.  That was my home.

24         The summer before that, at the open house, I took

25    my 84-year-old father through the precinct on a tour, and he

1    smiled at everybody that I introduced him to and told

2    everybody how proud he was that his daughter was there as a

3    police officer protecting Minnesota and Minneapolis.

4         It's been difficult in the months since this

5    happened.  The days to follow I was in uniform every day.

6    Most days a short day would be 20 hours.  We had to stand up

7    and protect the Fifth Precinct following the loss of our

8    home.  And we had a lot of help, which was nice, because it

9    meant a lot to us as street officers to be able to stand

10   there side by side with state patrol, with our federal

11   partners.

12        And it meant the world to me to find out that

13   somebody cared enough about our building and our home that

14   they would investigate this crime, because this crime wasn't

15   just against the City of Minneapolis, it was against every

16   officer that called that home.  It was against everybody in

17   the community around there.

18        I believe that what they did that night sent a

19   message to the world that it was okay to desecrate that type

20   of a building that meant and was a symbol of not only our

21   flag but everything that we call just in our democracy.  And

22   I think that that was a symbol that went out, and it's been

23   tried all over now -- in Seattle, Portland, we're hearing

24   all over.  That was the start of the civil unrest.  And I

25   think by sentencing the way that you have been and the way

1   that I'm hoping you will it sends a message that it's not

2   right.

3          I appreciate that Mr. Wolfe is getting the help he

4   needs.  He's the same age as my children.  But what nobody

5   really cared about is that I am a mom.  I'm a grandma.  I'm

6   a wife.  I'm a sister.  I'm a daughter.  And our building,

7   our home was taken from us.

8          I stood on the lines with officers in my gas mask

9   with my riot gear on.  I had ice bottles pelted at me,

10  rocks.  And I understand -- along with the over 200 officers

11  that also left our department -- we understand that we were

12  not supported the way we should've been.  And this does send

13  a message.  And I will be letting other officers know that

14  there is somebody that cares enough -- and the ATF, the

15  FBI and in the court systems -- about us and about what we

16  went through.

17         There's many of us that will probably never be the

18  same.  We've been damaged.  And we probably will always feel

19  like damaged goods.  I hope to get my power back.  And I

20  believe this is a step in that direction.  And I want to

21  thank you for that, Your Honor.

22         THE COURT:  All right.  Thank you.  Thanks for

23  coming in this morning.

24         Mr. Jacobs.

25         MR. JACOBS:  If I may, Your Honor?

1          THE COURT:  Yes.  You are fully vaccinated?

2          MR. JACOBS:  I am, Your Honor.

3          THE COURT:  Okay.

4          MR. JACOBS:  Your Honor is very well aware of the

5     context and the backdrop that this case transpired against,

6     and I won't reiterate or dwell on it, but I will start by

7     saying that the fact that the arsons in this case played out

8     against a backdrop of protests in Minneapolis is certainly

9     important.  That the arson in this case was at the Third

10    Precinct of the Minneapolis Police Department is certainly

11    important.  This is a backdrop against which this offense

12    took place.  It provides context.  But it's certainly not an

13    excuse for what happened, and it's certainly not an excuse

14    for Mr. Wolfe's conduct.

15          Your Honor, I'll start by providing a little bit

16    of context to some of the things that Mr. Olson said,

17    providing the government's point of view on a few of his

18    points.  The first is to agree with Mr. Olson that to some

19    extent Mr. Wolfe's culpability is diminished by the

20    difficulties he's faced in his child, by his substance-abuse

21    issues, by his mental-health issues.  By all accounts he had

22    a challenging childhood.  It seems many times Mr. Wolfe was

23    forced to be the adult in the room and that was a situation

24    for which he was ill-equipped.  His substance-abuse issues

25    and his mental-health challenges were certainly exacerbated

1    by that.  Again, this is not an excuse or justification for

2    his actions, but it provides context for them.

3           The second point is to confirm something that

4    Mr. Olson said, which is that after Mr. Wolfe was arrested

5    he did meet with the government.  He met with the government

6    multiple times.  He met with the St. Paul Police Department.

7    He met with ATF.  He met with FBI.  And he did immediately

8    accept responsibility.  He was open and honest in meeting

9    with the government.  He did not minimize his conduct.  And

10   that is separate and apart from an argument about his role

11   in the conduct, but he did not minimize the actual conduct.

12   I believe, in my estimation, that he was truthful and he was

13   honest.  And he did immediately accept responsibility, and

14   to the government that means something and that counts for

15   something.

16          Finally the last point, Your Honor, is about

17   Mr. Wolfe's criminal history.  To an extent Mr. Wolfe's

18   criminal history is concerning.  This is his first felony

19   offense, but he does have some significant previous

20   convictions for domestic-abuse issues.  That's different

21   than what we're standing up here talking about today -- an

22   arson at the Third Precinct -- but I think it's worth

23   mentioning.  I think it's important to take that into

24   consideration as we think of this.

25          But, Your Honor, I also want to share a little bit

1  more context:  the context of officers who were stationed in

2  the Third Precinct, the context of individuals who lived in

3  that area, context of residents of Minneapolis in general

4  who watched this play out back in May of 2020.

5          Your Honor, you just heard from a few individuals

6  who shared the impact of this crime.  You've also read many

7  of the victim impact statements that other police officers

8  and community members and others have submitted to the

9  Court.  And to those accounts I would only add that the

10  destruction of an active police precinct in the City of

11  Minneapolis was nearly unfathomable a year ago, but it did

12  happen, Your Honor.

13          I can provide some of my own context about the

14  destruction of the Third Precinct.  I walked through the

15  precinct.  I firsthand saw the damage.  I can attest to

16  melted furniture, to destruction, to vandalism, to spray

17  paint, to 45 different areas of origin -- 45 separate fires

18  set in and around that building.  And it was abundantly

19  clear walking through the Third Precinct that the rage and

20  the anger was directly thrust upon that building -- that

21  building as a symbol and that building as a structure.  And

22  that in no way excuses the conduct of Mr. Wolfe or his

23  co-conspirators, but it does create an important

24  juxtaposition between the destruction and the damage to the

25  Third Precinct and destruction and damage to schools, post

1   offices, liquor stores, pawn shops throughout the Twin

2   Cities.

3           In contrast, Your Honor, to the vast destruction

4   that we saw unfold in the Twin Cities, you have the specific

5   actions that Mr. Wolfe took that night.  And I think it's

6   important to note that Mr. Wolfe's specific conduct did play

7   a seemingly small role in the overall destruction.  He

8   pushed a barrel into a fire outside the precinct.  That fire

9   was already burning.  He knew it would engulf the fire and

10  make the fire bigger, it would accelerate the fire.

11          In the government's estimation, he had a

12  below-average involvement compared to his co-conspirators --

13  both indicted and unindicted.  And to an extent the

14  government understands his arguments that he played a small

15  role in the destruction of the Third Precinct.  But, Your

16  Honor, as I said before, there is no small role when it

17  comes to the destruction of an active police precinct.

18  There's no small role when it comes to someone lighting or

19  accelerating or making bigger a fire at the entrance to a

20  building with an unknown number of people inside that

21  building.

22          To that argument I also respond that there's no

23  small role when it comes to the negative effect and the

24  damage to the movement that Mr. Wolfe and others were

25  purporting to be supporting when they were down there, the

1      detrimental effect caused by the actions of a very small

2      number of people who went from peaceful protest and crossed

3      the threshold to damage, violence, destruction, and arson.

4              I'd also note that Mr. Wolfe following the

5      incident with the barrel went into the building, went in,

6      took multiple pieces of police equipment that he was

7      actually wearing at the time he was arrested.

8              And finally, Your Honor, I would note that

9      Mr. Wolfe pled guilty to conspiracy to commit arson and with

10     that he takes responsibility for the actions of his

11     co-conspirators.  And Mr. Wolfe may rightly view it unfair

12     or lack of proportionality to say that he's being held

13     responsible for actions of multiple people who set 45 fires

14     throughout the precinct.  And to that, Your Honor, we

15     respond that that's precisely why a significant sentence is

16     required here, to send a message that the conduct here is

17     unacceptable and that doing so will incur substantial

18     penalty.

19             And, Your Honor, I'd end with one final point,

20     which is that the government was thoughtful in its charging

21     decision as to Mr. Wolfe charging a 371 conspiracy.  For

22     many of the reasons I've reiterated today and Mr. Olson

23     reiterated today, that we both include in our sentencing

24     positions -- about Mr. Wolfe's background, about the

25     culpability of many versus the culpability of some -- that

1    decision to charge a 371 conspiracy took those things into

2    account.  And for that reason, Your Honor, we'd request that

3    the Court impose a sentence of 42 months' imprisonment.

4           THE COURT:  Thank you, Mr. Jacobs.

5           I have carefully reviewed the Presentence

6    Investigation Report and the addendum to the report.  I have

7    also read the many victim-impact statements that were

8    incorporated into the report, as well as the letters

9    submitted by and on behalf of Mr. Wolfe.  I now accept the

10   plea agreement, and I am prepared to impose the sentence.

11          It is the judgment of the Court that you, Branden

12   Michael Wolfe, are sentenced to prison for a term of 41

13   months to be served consecutively to any sentence you

14   receive in connection with the criminal charges that are now

15   pending against you in Hennepin County District Court, Case

16   No. 27-cr-20-13156.

17          No fine is imposed.

18          You are ordered to pay restitution in the total

19   amount of $12 million.  You are jointly and severally liable

20   for this amount with Dylan Shakespeare Robinson, and your

21   other co-defendants -- Davon De-Andre Turner and Bryce

22   Michael Williams -- will likely be held jointly and

23   severally liable for this amount as well.  This amount is

24   due and payable immediately.  The interest requirement is

25   waived.

1        While you are incarcerated, you must make payments

2   toward your restitution obligation as follows:  If you are

3   working UNICOR, you must make monthly payments of 50 percent

4   of your earnings.  If you are not working UNICOR, you must

5   make quarterly payments of $25.

6        After you are released from prison, you must begin

7   making payments toward any remaining restitution obligation

8   within 30 days of your release.  You must make monthly

9   payments of at least $100.  If the probation officer

10  determines that you are able to pay more than $100 per

11  month, then you must make restitution payments in the amount

12  directed by the probation officer.

13       Your payments should be made to the Clerk of the

14  United States District Court for the District of Minnesota,

15  who will forward your payments to the City of Minneapolis.

16       Your obligation to pay the full amount of

17  restitution continues even after your term of supervised

18  release ends.  If you are not able to pay the full amount of

19  restitution at the time your supervised release ends, you

20  may work with the United States Attorney's Office Financial

21  Litigation Unit to arrange a restitution payment plan.

22       You must pay a special assessment in the amount of

23  $100 to the United States, due immediately.

24       On being released from prison, you will be placed

25  on supervised release for a term of two years.  While you

1    are on supervised release, you must comply with the

2    following conditions:

3            First, you must comply with the mandatory and

4    standard conditions of supervised release described in

5    Section 5D1.3 of the version of the United States Sentencing

6    Guidelines that took effect on November 1st, 2018.

7            Second, you must participate in a program for

8    substance abuse as directed by the probation officer.  The

9    program may include testing and inpatient or outpatient

10   treatment, counseling or a support group.  You must

11   contribute to the costs of such treatment as determined by

12   the Probation Office Co-Payment Program.

13           Third, you must not use alcohol or other

14   intoxicants, whether legal or illegal, and you must not

15   enter bars, liquor stores or other establishments whose

16   primary business is the sale of alcoholic beverages.

17           Fourth, you must participate in a psychological or

18   psychiatric counseling or treatment program as directed by

19   the probation officer.  You must contribute to the costs of

20   such treatment as determined by the Probation Office

21   Co-Payment Program.

22           Fifth, you must participate in educational

23   programming, as directed by the probation officer, to obtain

24   a high school diploma or a general equivalency diploma.

25           Sixth, you must promptly notify the probation

1    officer of any material change in your financial

2    circumstances that might affect your ability to pay

3    restitution.

4            And, finally, seventh, if you do not maintain

5    full-time, lawful employment as deemed appropriate by the

6    probation officer, you may be required to do

7    community-service work for up to 20 hours per week until you

8    become employed.  You may also be required to participate in

9    training, counseling or daily job searching as directed by

10   the probation officer.

11           I direct that the Probation Office furnish to you

12   a written statement of all the conditions of your supervised

13   release.

14           As you requested, I will recommend that you be

15   designated to a facility in or near Minnesota.

16           Mr. Olson, do you think I should also add an RDAP

17   recommendation?

18           MR. OLSON:  Yes, Your Honor.

19           THE COURT:  All right.  I will also add that you

20   be allowed to participate in the RDAP program.

21           In determining what sentence to impose, I have

22   treated the range recommended by the United States

23   Sentencing Guidelines as the starting point and the initial

24   benchmark as *Gall v. United States* requires.  I have not,

25   however, presumed that the Guidelines range is reasonable.

1    I have instead carefully considered all of the factors

2    described in 18 U.S.C. Section 3553(a), including the need

3    for the sentence to be sufficient, but not greater than

4    necessary, to comply with the purposes set forth in Section

5    3553(a)(2).

6              As to the sentence of imprisonment, I've sentenced

7    Mr. Wolfe to 41 months in prison, which is the bottom of the

8    range recommended by the United States Sentencing

9    Guidelines.

10             On the evening of May 28th of 2020 -- an evening

11   on which many thousands of people across the country were

12   protesting the murder of George Floyd while also heeding the

13   pleas of the Floyd family to remain peaceful -- Mr. Wolfe

14   decided to protest police brutality by committing a crime

15   (really, by committing a series of crimes).  Specifically,

16   Mr. Wolfe decided to join a mob that attacked, looted, and

17   destroyed the Third Precinct headquarters.

18             At the time that Mr. Wolfe was feeding a fire near

19   the entrance to the Third Precinct, he had no idea how many

20   people were in that building, where they were located,

21   whether they were impaired or unimpaired or conscious or

22   unconscious or whether they might be trapped and burned

23   alive by the fire that he was feeding.

24             Nor does it appear that Mr. Wolfe gave a moment's

25   thought to the extraordinary harm he was helping to inflict

1    on the people who worked in that building.  The Third

2    Precinct was home not just to the four former police

3    officers charged with crimes in connection with the murder

4    of George Floyd, but to many people who had absolutely

5    nothing whatsoever to do with that murder.  The Third

6    Precinct was home to dozens of good police officers --

7    police officers who came to work every day and risked their

8    lives to keep their fellow citizens safe.  The Third

9    Precinct was also home to many City employees who were not

10   police officers or even involved in law enforcement.  The

11   actions of Mr. Wolfe and the mob that he joined took away

12   what was for many of these people a second home -- one of

13   the few places where they could feel safe, and a place where

14   they could gather with each other and members of the

15   surrounding community.

16          Mr. Wolfe also appears to have given no thought to

17   how his actions would affect the people served and protected

18   by the Third Precinct.  The Third Precinct is an area where

19   many good, hard working, law-abiding people live, work,

20   start businesses, and raise families.  Many of those who

21   live in the Third Precinct immigrated to the United States

22   in order to flee violence and lawlessness in their home

23   countries.  The actions of Mr. Wolfe and his co-conspirators

24   terrorized these people; to this day, they feel unsafe in

25   their own homes and neighborhoods.  Crime has increased

1    dramatically in the Third Precinct, and its residents have

2    borne the brunt of that crime.  I recognize that crimes

3    increase for many reasons, but the fact that there are fewer

4    police officers and the fact that the remaining police

5    officers are stationed far away from the Third Precinct --

6    both of which are the direct result of the destruction of

7    the Third Precinct headquarters -- certainly does not help.

8         Mr. Wolfe's actions in helping to burn the Third

9    Precinct are extremely serious in themselves.  But he did

10   not just help to burn the Third Precinct; he also helped to

11   loot it.  Mr. Wolfe went into the building at least twice to

12   steal police property for himself, including a police vest,

13   duty belt, set of handcuffs, ear piece, baton, knife, riot

14   helmet, pistol magazine, police radio, police overdose kit,

15   uniform name plates, and ammunition.  Until he was arrested,

16   Mr. Wolfe showed zero shame or remorse about his role in

17   burning and looting the Third Precinct.  To the contrary, he

18   posted on social media about stealing items from the

19   building, and, when he was arrested almost a week after the

20   Third Precinct was destroyed, he was wearing the stolen

21   police vest (on which he'd affixed his own name) and stolen

22   duty belt, and he was carrying the stolen tactical baton.

23        And, finally, although Mr. Wolfe has just two

24   misdemeanor convictions, he has twice been charged with

25   felony battery and once with felony kidnapping in connection

1    with alleged assaults on his pregnant girlfriend.  Those

2    cases were not prosecuted because, as so often happens in

3    domestic-violence cases, the alleged victim later refused to

4    cooperate with the prosecution.  I'm not assuming that the

5    allegations against Mr. Wolfe are true, but the fact that he

6    was charged is troubling, especially given that his two

7    misdemeanor convictions also arise out of conflicts with the

8    same girlfriend.

9           Mr. Wolfe argues that, despite the seriousness of

10   his crime and the extraordinary harm that he helped to

11   cause, he should be put on probation.  But Mr. Wolfe is

12   already on probation; in fact, he was on probation at the

13   time that he helped burn down and loot the Third Precinct.

14   Moreover, after being indicted in this case, Mr. Wolfe was

15   placed on pretrial supervision.  Needless to say, Mr. Wolfe

16   should have been on his very best behavior.  He was not.

17   Instead, Mr. Wolfe committed more than 20 major and minor

18   violations of the rules of the halfway house at which he was

19   living.  Even after being hailed before Magistrate Judge

20   Menendez and being explicitly warned both by her and his

21   probation officer that he has to follow the conditions of

22   his presentence release, which includes obeying the rules of

23   the halfway house, Mr. Wolfe has continued to violate the

24   rules of the halfway house as recently as yesterday.  A term

25   of probation would not reflect the seriousness of

1    Mr. Wolfe's offense, promote respect for the law or deter

2    others from committing similar crimes in the future.  But I

3    also have little confidence that Mr. Wolfe would follow the

4    conditions of his probation.

5         Given the severity of Mr. Wolfe's crime and the

6    need to deter similar crimes in the future, I considered

7    giving Mr. Wolfe a 60-month sentence, which would have been

8    the statutory maximum because of the decision of the

9    government to charge Mr. Wolfe only with conspiracy rather

10   than with arson.  I decided not to impose a longer sentence

11   for several reasons:

12        First, although Mr. Wolfe was involved in an awful

13   crime, he played a very small role in that crime.  As far as

14   the record reflects, his participation in the burning of the

15   Third Precinct was limited to pushing a wooden barrel into

16   an already existing fire at a time when the building was

17   already burning.  Mr. Wolfe did not himself start or try to

18   start any fire.

19        Second, Mr. Wolfe suffers from significant mental

20   illness and chemical dependency.  He had a difficult

21   childhood.  He was home-schooled after the fifth grade and

22   kicked out of his home at age 18.  He then became a homeless

23   drifter.  He used marijuana on a daily basis and frequently

24   abused alcohol.  After he was arrested in this case, he was

25   diagnosed with bipolar disorder.  He says that, on the

1    evening that he helped to burn and loot the Third Precinct,

2    he was impaired by drugs and alcohol and experiencing a

3    manic episode.  Since his arrest, despite his other

4    problems, Mr. Wolfe has remained sober, he has taken his

5    medications, and he has been very invested in his therapy

6    sessions.

7            And finally, Mr. Wolfe is a very young man who has

8    never spent more than a few days in jail.  A term of 41

9    months in prison is by far the longest sentence that

10   Mr. Wolfe has ever received from any court.  I hope that

11   this sentence will serve as a wake-up call and that, helped

12   by the treatment and medication that he will continue to

13   receive, Mr. Wolfe will be able to turn his life around.

14           For all these reasons, I find that a sentence of

15   41 months is sufficient but not greater than necessary to

16   accomplish the goals of Section 3553(a).

17           As to the term of supervised release, I have

18   imposed a two-year term of supervised release along with

19   conditions to help ensure that Mr. Wolfe continues to get

20   help for his mental illness and chemical dependency, and to

21   make sure that he makes progress in paying restitution.

22           And finally, I have not imposed a fine because

23   Mr. Wolfe cannot afford to pay a fine and because I want him

24   to devote any available funds to paying restitution.

25           All right.  Mr. Wolfe, you have the right to

1    appeal your conviction if you believe that your guilty plea

2    was unlawful or invalid for any reason.

3            Usually defendants have the right to appeal their

4    sentence, but you entered into a plea agreement with the

5    government, and in that plea agreement you gave up your

6    right to appeal a sentence of the length I've just imposed.

7    Courts usually enforce those agreements, but, if you think

8    that, notwithstanding your plea agreement, you still have

9    the right to appeal your sentence, you can go ahead and

10   appeal your sentence and you can make your argument to the

11   court of appeals.

12           If you do want to appeal your conviction or your

13   sentence or both, you have to file a notice of appeal, and

14   you have to do so within 14 days after I enter the judgment

15   in your case, which will be later today.  You can ask

16   Mr. Olson to file an appeal for you or you can ask the Clerk

17   of Court to file a notice of appeal on your behalf.

18           If you cannot afford to pay the costs of an

19   appeal, you can ask for permission to be excused from paying

20   those costs.

21           The Presentence Investigation Report will be kept

22   in the Court's files under seal.  If an appeal is filed,

23   that report will be delivered to the Court of Appeals.

24           All right.  The last thing to address is release

25   status.  So, Mr. Olson, let me talk to you about this.  I'm

1    concerned about letting Mr. Wolfe remain free.  I'm

2    concerned because he does not have deep ties to this area.

3    He has no family here.  He has a girlfriend here, and I

4    think that's the extent of his ties.

5         I'm also concerned about the just endless series

6    of violations of the rules, including yesterday.  I mean, it

7    says a lot to me when someone the day before he shows up for

8    sentencing is still violating the rules of the halfway house

9    despite being warned by a federal magistrate judge about

10   what the likely consequences of that would be.  So I have to

11   tell you I'm nervous about the idea of letting him remain

12   free.

13         MR. OLSON:  Your Honor, I'd ask that the Court

14   give him a benefit of a brief period and then voluntarily

15   surrender to the Marshal's Office.  There's a couple --

16   there are some practicalities involved here, including the

17   simple process of cleaning out his place at the halfway

18   house, which would be of assistance to them, as well as the

19   detrimental effect the lack of voluntary surrender has for

20   his security classification, which will impact actually the

21   entire 42-month sentence -- 41-month sentence that he has to

22   do.

23         You know, his -- I talked to him about this stuff

24   and I'll just say that he really is trying, but he doesn't

25   succeed and he does stuff that he shouldn't, and he doesn't

1   do things necessarily as responsible as the rest of us.  I

2   don't think he'd want me to use his mental illness as an

3   excuse, but he really does mean well and he is trying.

4           So if the Court would give him a brief period to

5   finish up at the halfway house and report to the Marshal's

6   Office, he'd really appreciate it.

7           THE COURT:  Does he get credit for self-surrender

8   even if it's just a 24-hour period or something like that?

9           MR. OLSON:  Yeah, I have had judges order people

10  to self-surrender to the marshals after court and then you

11  get self-surrender.  The period doesn't matter.  But if

12  you're in custody, it's a significant hit on you in terms of

13  your security classification.

14          So even 24 hours voluntary surrender does him a

15  world of good.  And it really does impact both your

16  placement and then how -- which then impacts the quality of

17  what you do while you're incarcerated.  So even having him

18  report this afternoon would be fine, but that alone is a big

19  thing.

20          You know, the rules violation, it's irritating to

21  everybody.  It's irritating to me.  I mean, I understand

22  that.  It's not like he's an entire scofflaw.  He just has a

23  hard time sometimes getting up out of bed and doing things

24  like the rest of the world.  It's hard sometimes.

25          THE COURT:  I mean, these poor people who work at

1  these halfway houses are in the middle of the pandemic going

2  to work everyday and working with guys who -- I mean,

3  they're doing it so these guys have some place other than

4  jail.

5          MR. OLSON:  I'm with you.

6          THE COURT:  They get thanked for it by disrespect,

7  by insults, by refusals to obey just simple commands.  You

8  know, I have a responsibility to those people as well.

9          MR. OLSON:  Yeah, well, I'm with you.  So I'm not

10  asking that it be a lengthy stay but give him a short period

11  of time to get his stuff together and then report to the

12  Marshal's Office, but don't make it immediate.  So don't

13  take him into custody right away.

14          THE COURT:  Okay.  Mr. Jacobs, let me hear what

15  your thoughts are on this.

16          MR. JACOBS:  Your Honor, briefly, we share the

17  Court's concern about Mr. Wolfe's challenges with abiding by

18  supervision.  But I think in the interest of allowing

19  Mr. Wolfe to work on his mental-health challenges and

20  substance-abuse issues, we have no objection or issue with a

21  short period of turn-around for self-surrender.

22          THE COURT:  Okay.  I don't want to give him more

23  than a short period.  So what I'll do is have him report

24  tomorrow, Mr. Olson, which will give him self-surrender.

25          MR. OLSON:  Should he report to the Marshal's

1    Office here in this building?

2            THE COURT:  Yes.

3            So, Mr. Wolfe, I'm going to order you to report

4    tomorrow morning at 10:00 a.m. to the United States

5    Marshal's Service here in this courthouse.  You can talk to

6    Mr. Olson about what that involves.

7            I'm taking a chance on you.  If it was not for

8    what I just heard from your counsel, my inclination would be

9    to have the marshals take you right now.  But by giving you

10   a chance to self-surrender, it's going to help you a lot as

11   you serve in prison.  You're going to get more programming.

12   You're going to get a better facility.  So I'm taking a

13   chance on you.  I need you to give me your word you're going

14   to show up tomorrow morning at 10:00.  Will you do that?

15           THE DEFENDANT:  Yes, sir, Your Honor.

16           THE COURT:  Okay.  So you should report to the

17   United States Marshal here at 10:00 tomorrow morning, then.

18   Okay?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  All right.  Mr. Olson, anything else?

21           MR. OLSON:  My objection on the restitution

22   order --

23           THE COURT:  Is noted and preserved.

24           MR. OLSON:  -- is noted and preserved.

25           THE COURT:  Yes.  That is noted, and your

1        objection is preserved.

2                  Anything else, Mr. Jacobs?

3                  MR. JACOBS:  No, Your Honor.

4                  THE COURT:  Okay.  Thank you.

5                  THE COURTROOM DEPUTY:  All rise.

6                  (Court adjourned at 10:16 a.m.)

7                              *     *     *

8            I, Debra Beauvais, certify that the foregoing is a

9        correct transcript from the record of proceedings in the

10       above-entitled matter.

11                  Certified by:  *s/Debra Beauvais*
                                   Debra Beauvais, RPR-CRR
12

13

14

15

16

17

18

19

20

21

22

23

24

25